UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL UNION 89, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 2: 24-121-DCR |
| V. | ) ) | |
| THE KENTON COUNTY AIRPORT BOARD, doing business as Cincinnati/Northern Kentucky International Airport, et al., | ) ) ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Members of the Teamsters Local Union 89 want to picket near the Amazon Air Hub at the Cincinnati/Northern Kentucky International Airport. The union submitted an application to the Kenton County Airport Board on July 23, 2024, requesting permission for approximately 100 individuals to picket along the road outside Amazon's facility located at 289 Wendell H. Ford Blvd. in Erlanger, Kentucky.[1] The Airport Board denied the application for two primary reasons: 1) the requested picketing site is not an approved area for expressive activity as outlined in the Board's Rules and Regulations; and 2) the Rules and Regulations permit a maximum number of ten individuals in any designated area at a given time.

---

[1] The plaintiff alternatively describes the Picketing Site as being in Erlanger, Kentucky, and Hebron, Kentucky.

- 1 -

The union seeks a temporary restraining order and preliminary injunction allowing its members to picket on public sidewalks, easements, and rights of way around the Amazon Air Hub. The Court conducted an evidentiary hearing regarding the plaintiff's motion on August 1, 2024. Having considered the parties' arguments and applicable law, the Court finds that the plaintiff is likely to succeed on its claim that the defendant's actions violate the plaintiff's rights under the First Amendment of the United States Constitution. Accordingly, the plaintiff's motion for a preliminary injunction will be granted.

## I.

Plaintiff General Drivers, Warehousemen and Helpers, Local Union 89, Affiliated with the International Brotherhood of Teamsters ("the Teamsters" or "the union") is in the process of actively organizing workers employed by Amazon Com Services LLC and its subsidiary Amazon Air (collectively, "Amazon") at the Amazon Air Hub located within the Cincinnati/Northern Kentucky International Airport ("CVG").[2] Bryan Trafford, the assistant to the President of Local Union 89, testified during the TRO hearing that Amazon workers at CVG have displayed a strong interest in joining the union, although there has not yet been a formal vote regarding whether they will do so. Trafford is the union's lead organizer at the Amazon Air Hub at CVG and has been "on the ground" for about three months teaching Amazon workers about their rights under Section 7 of the National Labor Relations Act, teaching them organizing skills and tactics, and "helping enforce those rights."

---

[2]     The Complaint alleges that "various pro-union Amazon employees" have filed unfair labor charges with the National Labor Relations Board regarding Amazon's alleged efforts to resist unionization. The instant strike is based on Amazon's alleged unfair labor practices. [Record No. 1, ¶¶ 11-12]

On July 23, 2024, union attorney Rachel Rekowski submitted an "Application to Engage in Expressive Activity" to CVG on behalf of Teamsters Local 89.  [Record No. 1-2]  Rekowski indicated that "Amazon Air Hub workers will exercise their Section 7 rights under the National Labor Relations Act to strike and picket along the public road outside Amazon's facility located at 289 Wendell H. Ford Blvd., Hebron, KY 41048."  *Id.*  The type of expressive activity was described as "Marching/Picketing", and the number of participants was reported as "[a]round 100."  *Id.*  Rekwoski requested permission for the group to picket from "July 23 - July 28" from 9:00 a.m. through 6:00 p.m.  Rekowski also included an attachment indicating that the march or picket would consist of an unfair labor practice strike.  *Id.* at p. 5.

Chris Heitzman, CVG Assistant Police Chief/Airport Security Coordinator, responded to Rekoswki by email on the afternoon of July 23, 2024, notifying her that the application had been denied.  Heitzman advised that the requested picketing site "is not an approved area as outlined in Kenton County Airport Board Rules and Regulations Section 205.06 and Exhibit A-4" and that "[t]he number of persons participating exceeds the maximum number of 10 persons as outlined in the application."  [Record No. 1-3]  Heitzman also reminded Rekowski that applications must be received "no more than seven days, or less than three days, prior to the first date requested by the applicant for the proposed expressive activity."  *Id.*

Notwithstanding the denial of the application, the group picketed at the Amazon entrance on July 24.  Wendell H. Ford Blvd. is a four-lane road (with a center turning lane), located in the cargo operations area of CVG.  The speed limit is 35 miles per hour.  Amazon's entrance is located at a four-way intersection with a traffic light at 289 Wendell H. Ford Blvd., with grassy areas on both sides of the entrance.  There is no sidewalk near the entrance, but there is a public bus stop with a sidewalk about one hundred yards away.

Trafford testified that he was the first to arrive on the scene shortly before 1:00 p.m. CVG police officers arrived about the same time, before picketing began. Trafford testified that the officers questioned why he was there when the application to picket was denied. However, the officers did not order any picketers to disburse. Ultimately 75 to 80 picketers showed up. The group includedsome Amazon workers and some Teamsters. Trafford testified that the picketers followed the training that he had given them prior to that day, which included avoiding blocking the road and always moving. He also noted that most of the picketers wore reflective safety vests, but he did not feel it was necessary during this particular picket since it was conducted during bright daylight hours.

The parties presented photographs and video footage of the July 24 picket. Picketers stood in the grassy areas adjacent to Amazon's entrance and marched across the entrance when traffic was not actively flowing through the roadway. At one point, a significant number of picketers surrounded and marched around a single car that was stopped at the red light as it prepared to exit the Amazon facility. While cars entering and exiting Amazon appeared to be slightly delayed at times, the picketers disbursed consistent with the changing traffic lights. The picketers also displayed a 12-foot tall, (approximately) 8-foot wide, inflatable mascot in the grassy area beside Amazon's entrance. The parties referred to the inflatable as a "Fat-Cat."

CVG Chief of Police Matt Lambert testified regarding the apparent safety of picketing along Wendell H. Ford Blvd. According to Lambert, speeding can be a problem on the straight stretch of roadway in front of Amazon. Further, the boulevard is often heavily congested due to the number of businesses located in the area. The defendants introduced video footage of a picket that occurred at a DHL facility directly across the road from Amazon in December 2023. That footage showed picketers blocking the DHL entrances and walking in Wendell H. Ford

Blvd.  Lambert opined that pedestrians in the roadways create various safety hazards including vehicle-on-pedestrian accidents and vehicle-on-vehicle accidents.

CVG has Rules and Regulations concerning expressive activity at the airport.  They provide, in relevant part:

> 205.00 Use of Airport for First Amendment Activities . . . .
>
> A.  Definitions.  As used in Regulation 205.00 only:
> (1)  Designated Area – one of several places at the Airport in which engaging in Expressive Activity is permitted with a duly authorized permit.
> (2) Expressive Activity – the act of engaging the public in Free Exercise/Literature Distribution, Marching/Picketing, or Solicitation. . . . .
> (4) Marching/Picketing – the posting, procession, or gathering of a group of individuals who are supporting or protesting a particular subject in a combined demonstration to the public, not involving Solicitation. . . . .
> (6) Permit – the certificate issued by the Chief Executive Officer or the Chief Executive Officer's authorized representative authorizing the Permittee(s) named on the certificate to engage in Expressive Activity at the Airport, subject to the regulations set forth in this Regulation 205.00. . . .
>
> (B) Limiting Construction.  For purposes of Subsection 205.00, the definition of "Expressive Activity" shall not include or refer to the communication, conveyance, or document distribution of an idea, message, or opinion that is incidental to the Person's purpose for being at the Airport and is not intended for the public-at-large, such as conversation, discussion, or other forms of contact among and between travelers.
>
> 205.02 Purpose.
>
> …. The intent of these time, place, and manner regulations is to ensure that any Person engaging in Expressive Activity at the Airport does not materially impact or affect the Airport's security, operational efficiency, revenue, and/or aesthetics—all of which are fundamental, essential components of efficient air travel—in a manner that undermines the Airport's primary purpose.
>
> 205.03 Considerations.
>
> The time, place, and manner regulations of this Regulation 205.00 are necessary to address the following concerns, all of which are paramount considerations the Board has taken into account in striking a balance between the First

- 5 -

Amendment right of free expression and the Board's right to preserve the Airport for efficient air travel:

A. Providing ample channels of communication to Persons seeking to engage in Expressive Activity at the Airport;

B. Ensuring adequate nearby police presence for the protection of Persons engaging in Expressive Activity;

C. Limiting such Expressive Activity to certain areas of the Airport in which the Expressive Activity will not adversely impact essential components of efficient air travel, such as security, operational efficiency, revenue, and aesthetics; and

D. Protecting users of the Airport from harassment, intimidation, and unlawful conduct on the part of Persons engaging in Expressive Activity.

[Record No. 9-1]

"Airport" is defined as "[a]ll land and improvements within the geographic boundary lines of the Cincinnati/Northern International Airport, Boone County, Kentucky."[3]

Prior to the picketing incident in December 2023, CVG only had four Designated Areas for expressive activity, which were all located in or near the airport terminal. Since then, CVG has created three additional Designated Areas that are closer to the cargo operations area. Two of the new Designated Areas are within view of Amazon's entrance. Chief Lambert testified that the closest Designated Area sits at the intersection of South Airfield Drive and Wendell H. Ford Blvd. and is approximately 50 x 20 feet in size.

The plaintiff's picketing persisted until about 5:00 p.m. on July 24, 2024, but has not occurred since then. The plaintiff filed a Complaint that same day alleging that the defendants' actions violate the First Amendment to the United States Constitution (Count 1), Section 7 of

---

[3] Rules and Regulations of the Kenton County Airport Board Relating to the Operation and Control of the Cincinnati/Northern Kentucky International Airport, Rules-and-Regulations-11.13.23-_final_.pdf (ctfassets.net) (visited Aug. 6, 2024).

the National Labor Relations Act (Count 2), and Kentucky Constitution Section 1 and K.R.S. § 336.130 (Count 3).  On July 29, 2024, the plaintiff filed an emergency motion for a temporary restraining order and preliminary injunction to restrain the defendants from interfering with the plaintiff's right to engage in peaceful, lawful picketing activity in or around all public sidewalks, easements, and rights of way around 289 Wendell H. Ford Blvd.

## II.

Temporary restraining orders and preliminary injunctions are issued pursuant to Rule 65 of the Rules of Federal Procedure.  The Court considers four factors in determining whether to grant the plaintiff's motion.  *See Parton v. Parton*, 2022 WL 19915445, at *1 (E.D. Ky. Feb. 4, 2022) (observing that the applicable legal standards are the same for both types of relief). First, the Court examines "whether the plaintiff has established a substantial likelihood of success or probability of success on the merits" of its claim.  *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014) (quoting *Winnett v. Caterpillar*, 609 F.3d 404, 408 (6th Cir. 2010)).  Second, the Court assesses whether the plaintiff will suffer irreparable injury in the absence of the injunction.  *Id.* at 690.  Third, the Court evaluates whether the injunction would cause substantial harm to others.  Finally, the Court weighs "whether the public interest would be served" if the Court were to grant the requested injunction.  *Id.*

Each factor is balanced against the others and is not be considered prerequisites to relief.  *Id.*  The Sixth Circuit has noted in the context of First Amendment claims that balancing of the factors is skewed toward an emphasis on likelihood of success on the merits.  It has stated:

> When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.  With regard to the factor of irreparable injury,

for example, it is well-settled that "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury."

*Id.* (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)).  The appellate court also notes that, "the determination of where the public interest lies is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.*

### III.

### A.     Likelihood of Success on the Merits

### i.     The Picketing Site is a Traditional Public Forum

The plaintiff's motion for injunctive relief focuses primarily on its claim that the defendants' conduct violates the plaintiff's rights under the First Amendment of the United States Constitution.  The starting point in analyzing this claim is determining the nature of the forum where the plaintiff's speech is being restricted.  *See Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (acknowledging a forum-based approach for assessing governmental restrictions on use of property).  Regulation of speech on government property that has traditionally been available for public expression, such as public streets or sidewalks, is subject to strict scrutiny. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).  Likewise, regulation of speech in designated public forums (those that the government has opened for expressive activity by part or all of the public) is subject to strict scrutiny.  *Lee*, 505 U.S. at 678 (citing *Perry Educ. Assn. v. Perry Local Educs.' Assn.*, 460 U.S. 37, 45 (1983)).  That leaves all remaining public property, which is commonly referred to as non-public forums.  Any governmental regulation of speech in a non-public forum need only be

reasonable, so long as the regulation is not an effort to suppress expressive activity due to disagreement with the speaker's point of view. *Lee*, 505 U.S. at 679.

The plaintiff seeks to picket along "the public road outside Amazon's facility [and] on or around the Amazon Air Hub, including the public sidewalks, easements and rights-of-way outside Amazon's facilities and parking lots, located at or around 289 Wendell H. Ford Blvd.," which is located in CVG's "cargo operations area." The Supreme Court has concluded that airport *terminals* operated by public authorities are non-public forums for purposes of First Amendment analyses. *See Lee*, 505 U.S. at 680. But *Lee* did not address speech restrictions placed on streets, sidewalks, and similar areas when they are located on airport grounds.

Ordinarily, streets, sidewalks, and similar places are paradigms of the traditional public forum. *See Lee*, 505 U.S. at 679 (observing that "streets and parks . . . have immemorially been held in trust for the use of the public and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."). But the defendants contend that the Court must inquire further regarding the specific characteristics of the proposed picketing site. *See United States v. Kokinda*, 497 U.S. 720, 727 (1990) (observing that "[t]he mere physical characteristics of the property cannot dictate forum analysis"); *Greer v. Spock*, 424 U.S. 828, 836 (1976) (noting that a place owned or operated by the government does not become a "public forum" simply because members of the public are permitted to freely visit).

In *Greer*, 424 U.S. 828, various parties challenged regulations that prohibited political campaigning and distributing literature on the Fort Dix Military Reservation. The respondents alleged that the regulations violated the First Amendment because Fort Dix was open to civilian traffic and nonpolitical civilian speakers had been invited to the base from time to

time.  The Court rejected the respondents' claim, stressing that a place does not become a public forum for purposes of the First Amendment just because members of the public are permitted freely to visit a place owned or operated by the government.  424 U.S. at 836. However, it relied on the unique position of a military base in reaching its decision, noting that the regulation ensured that military activities were kept "wholly free of entanglement with partisan political campaigns of any kind" and insulated the military "from both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates."  *Id.* at 839.

The decision in *Kokinda*, 497 U.S. 720 also is instructive.  There, volunteers for the National Democratic Policy Committee ("NDPC") set up a table on the sidewalk outside the Bowie, Maryland Post Office to solicit contributions, sell books, and distribute literature regarding political issues.  The Bowie postmaster asked the NDPC volunteers to leave but they refused.  The volunteers were subsequently arrested and convicted of violating 39 C.F.R. § 232.1(h)(1) (1989), which prohibits campaigning or soliciting contributions on postal premises.  497 U.S. at 723-24.  They appealed, arguing that § 232.1(h)(1), as applied to them, violated the First Amendment.

Unpersuaded that the sidewalk constituted a traditional public forum, the Supreme Court upheld the convictions.  497 U.S. at 727.  It noted, "[t]he postal sidewalk at issue does not have the characteristics of public sidewalks traditionally open to expressive activity."  *Id.* Unlike another sidewalk that ran parallel to the road, it led only from the parking area to the front door of the post office.  And it "was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city."  *Id.* at 728.

The defendants cite *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), where the Supreme Court determined that a "car card" in the Shaker Heights Rapid Transit System was not a traditional public forum for purposes of the petitioner's First Amendment challenge. The Court noted: "[W]e have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. It must provide rapid, convenient, pleasant, and inexpensive service to the commuters of Shaker Heights. The car card space, although incidental to the provision of public transportation, is a part of the commercial venture." The defendants focus on Justice Douglas' comment that, "a streetcar or bus is plainly not a park or sidewalk or other meeting place for discussion, *any more than is a highway*." *Id.* at 305 (Douglas, J., concurring) (emphasis added).

However, Justice Douglas went on to explain that bus and streetcar placards were in the same category as highway *billboards*, "which have long been used to display an array of commercial and political messages." *Id.* at 306. The defendants also rely on *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1207 (11th Cir. 1991), which held that interstate rest stops did not constitute public forums. But this conclusion was based on the fact that interstate rest stops do not exist independent of the interstate system, which is a relatively modern phenomenon and, therefore, could not have "immemorially been held in trust for the use of the public" for purposes of assembly. *Id.* at 1203.

The wealth of authority underscores courts' reluctance to treat public streets like Wendell H. Ford Blvd. as anything other than public forums. In *Frisby v. Schultz*, 487 U.S. 474 (1988), the Court examined a city ordinance that banned picketing "before or about" any residence. The appellants urged the Court to characterize their streets as a non-public forum based on their residential character and the fact that they had never been held open for public

communication. *Id.* at 480. But it declined, making clear that "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood." *Id.* The Court continued: "No particularized inquiry into the precise nature of a specific street is necessary; *all public streets are held in the public trust and are properly considered traditional public fora.*" *Id.* at 481 (emphasis added). *See also Brindley v. City of Memphis, Tenn.*, 934 F.3d 461, 467 (6th Cir. 2019) (noting that public streets are the "archetype of a traditional public forum"); *Ater v. Armstrong*, 961 F.2d 1224, 1227 (6th Cir. 1992) ("There can be no doubt that the streets of Jefferson County, Kentucky, are traditional public fora.").

The Sixth Circuit's decision in *Satawa v. Macomb Cnty. Road Commission*, 689 F.3d 506 (6th Cir. 2012), also is instructive. There, the county denied Satawa's application to place a creche on a 60-foot wide median during the Christmas season. The district court deemed the median "not a public forum" since it was not a place intended for citizens to come together and exchange ideas. *Id.* at 515-16. The Sixth Circuit reversed, noting that the median was landscaped, had pedestrian access, contained two park benches, and housed at least one plaque that could be read by someone standing on the median. In other words, it had features "that invite the public to spend time there." *Id.* at 519. The court acknowledged that the median was "in the middle of a busy eight-lane road, with a fifty-mile-per hour speed limit." *Id.* Further, the median had no dedicated parking and no access to restrooms. Still, the court determined, on balance, the totality of the circumstances supported the conclusion that it was a traditional public forum. *Id.* at 522.

The Sixth Circuit has observed that "[d]etermining what kind of forum a particular piece of property is may seem like an exercise in line-drawing, and in a sense it is." *Id.* The court's task is to determine which category describes the property in question best. *Id.* On

balance, the proposed picketing site is best characterized as a traditional public forum. Wendell H. Ford Blvd. is a public road, as evidenced by the numerous businesses located there, the traffic that travels along it daily, and the presence of a Transit Authority of Northern Kentucky bus stop. The parties have not identified the Amazon entrance/exit by name, but it also appears to be a public road, as the videos tendered by the parties show numerous vehicles traveling it freely. Additionally, the large, grassy area at the corner of Wendell H. Ford Blvd. and the Amazon entrance has features that "invite the public to spend time there," as the lawn is well manicured and there is sufficient room for many picketers. While the issues of parking and pedestrian access are not entirely clear, it appears that the picketers were able to access the area without difficulty.

### ii.      The Regulation is Not Narrowly Tailored

Having concluded that the proposed picketing site is a traditional public forum, the defendants' restrictions on the plaintiff's speech must: 1) be justified without reference to the content of the speech; 2) narrowly tailored to serve a significant governmental interest; and 3) leave open ample alternative channels for communication of the information. *Ater*, 961 F.2d at 1227 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

There is no evidence that the defendants' restrictions are content-based. In its brief in support of injunctive relief, the plaintiff improperly suggests that the restriction is not uniformly enforced because invitees to the airport may freely wear clothing or drive cars espousing protected speech. However, "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of a disagreement with the message it conveys." *Ward*, 491 U.S. at 791. While regulations that appear facially neutral

- 13 -

may become content based if applied "with an unequal hand," there is nothing to suggest that has occurred in this case. *See Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 404 (6th Cir. 2022) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)).

Chief Lambert and defense counsel emphasized during the TRO hearing that the defendants' regulations have nothing to do with the plaintiff's message and that Teamsters' applications to picket in Designated Areas have been approved. Further, there is no doubt that the defendants have a significant interest in maintaining the safety of individuals on CVG property. However, the plaintiff has successfully shown—at least at this stage of litigation— that the defendants' restriction on the plaintiff's speech is not narrowly tailored to serve the defendants' safety interests.

The government may impose reasonable time, place, and manner restrictions on protected conduct, even in traditional public forums. *Ater*, 961 F.2d 1227. But such restrictions may not be substantially broader than necessary to achieve the government's interest. *Id.* at 1229 (citing *Ward*, 491 U.S. at 800). Here, the defendants cite pedestrian and motorist safety as the reason for requiring the plaintiff to picket in one or more Designated Areas and for limiting protected activity to ten participants.

In determining whether regulation of expressive activity is narrowly tailored, the Court looks to whether the substantial government interest would be achieved less effectively without the regulation. *See Parks v. Finan*, 385 F.3d 694, 703 (6th Cir. 2004) (citing *Ward*, 491 U.S. at 799). Although government regulation of speech need not be the least restrictive or least intrusive means of serving the government's interests, the government cannot suppress speech based on mere convenience. *McCullen*, 573 U.S. at 486. Further, the government

cannot "regulate expression in a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* (quoting *Ward*, 491 U.S. at 799).

The Court is not persuaded by the defendants' reliance on *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984). There, the National Park Service issued a permit to Community for Creative Non-Violence ("CCNV") to conduct a demonstration in national parks in Washington, D.C. The purpose of the demonstration was to call attention to the plight of the homeless and the permit authorized CCNV to construct two symbolic tent cities in the parks. However, the Park Service denied the demonstrators' request that they be permitted to sleep in the symbolic tents based on a regulation that permits camping only in designated areas. The Court upheld the regulation as narrowly tailored to the government's substantial interest in maintaining the parks in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them. In explaining its decision, the Court noted that "to permit camping . . . would be totally inimical to these purposes." *Id.* at 296.

The decision in *McCullen* helps illustrate why the regulations in the instant matter (unlike *Clark*) are overbroad. *McCullen* involved a Massachusetts law that criminalized standing on a public way or sidewalk within 35 feet of an entrance or driveway to an abortion clinic. The asserted governmental interests at stake included "ensuring public safety outside abortion clinics, preventing harassment and intimidation of patients and clinic staff, and combating deliberate obstruction of clinic entrances." 573 U.S. at 490. The petitioners, who approached and talked to women outside such facilities, challenged the law as violating the First Amendment.

The Supreme Court began by noting that public streets and sidewalks are public forums, as they "remain one of the few places where a speaker can be confident that he is not simply

- 15 -

preaching to the choir." *Id.* at 476.  In concluding that the law was *not* narrowly tailored to serve the significant public interests at stake, the Court observed that the state's concerns could be addressed by preexisting criminal statutes forbidding assault, breach of the peace, trespass, and the like. *Id.* at 492.  Ultimately, the state "ha[d] available to it a variety of approaches that appear[e]d capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 494.

The respondents in *McCullen* argued that they had attempted to enforce other laws already on the books but those approaches did not work.  The Supreme Court did not accept that excuse, noting that the respondents did not identify a single prosecution brought under those laws within the prior 17 years. *Id.*  Unlike the respondents in *McCullen*, the defendants here do not contend that they tried any less intrusive approaches. *See, e.g.,* Ky. Rev. Stat. § 189.570 (motor vehicle laws governing pedestrian conduct).  And despite the alleged dangerous activity that ocurred during the 2023 DHL pickets, the defendants concede that neither CVG police nor any other authority issued a single citation during that period.

Like the plaintiff here, the petitioners in *McCullen* did not dispute the significance of the governmental interests at stake. [4]  But as in *McCullen*, CVG's Rules and Regulations "impose serious burdens" on the plaintiff's speech.  Designated Areas for expressive activity are available in the cargo delivery area at some distance from Amazon's entrance, but the defendants concede that the plaintiff's intended audience would be reduced by utilizing these

---

[4]     Counsel for the plaintiff agreed during the TRO hearing that the union's inflatable "Fat-Cat" mascot should be pulled back from corner of the street so that it does not block motorists' vision at the intersection. *See Tucker v. Fairfield Ohio*, 398 F3d 457, 463-64 (6th Cir. 2005) (concluding that protestors' use of temporary 12 x 8 foot rat balloon was constitutionally protected expression within parameters of the First Amendment).

sites.[5]  Further, there is no question that limiting the number of picketers to ten reduces the impact of the plaintiff's message.  The defendant explained during the TRO hearing that ten was selected as the maximum number of participants due to the size of the Designated Areas and parking availability.  But "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."  *McCullen*, 573 U.S. at 495.

## B.     Remaining Factors

"When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor."  *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)).  In other words, the remaining three factors "often hinge on the first factor."  *Id.*

The loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury.  *Elrod,* 427 U.S. at 373 (1976).  Accordingly, for purposes of considering a motion for a preliminary injunction, this factor merges with the plaintiff's likelihood of success.  *Monaghan v. Sebelius*, 916 F. Supp. 2d 802, 811 (E.D. Mich. 2012) (citing *McNeilly v. Land*, 684 F.3d 611, 620-21 (6th Cir. 2012)).  Because sufficient evidence has been presented to support a finding that the plaintiff is likely to succeed on the merits of its First

---

[5]      While providing alternative channels of communication cannot cure an overbroad regulation of protected speech, the Court questions the adequacy of the Designated Areas for expressive activity.  *See Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 607 (6th Cir. 2005).  The key inquiry for purposes of this analysis is whether the proffered alternatives allow the speaker to reach its intended audience.  *Phelps-Roper v. Strickland*, 539 F.3d 356, 372 (6th Cir. 2008).

Amendment claim, it necessarily has shown that it is likely to be irreparably harmed by the alleged deprivation of its First Amendment rights. *See McNeilly*, 684 F.3d at 620-21.

The determination of where the public interest lies also turns largely on whether the plaintiff's First Amendment rights are violated because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Conn. Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Finally, the Court finds that granting the injunction would not result in a risk of substantial harm to others. The plaintiff has represented that it intends to engage in peaceful, safe, and lawful picketing activity under section 7 of the National Labor Relations Act, 29 U.S.C. § 157 and Kentucky Revised Statutes § 336.130. If any picketing activity presents harm to the public or otherwise is contrary to law, traditional law enforcement measures may be implemented to address the situation.

## IV.

In response to the plaintiff's motion for a preliminary injunction, the defendant makes a passing request for the Court to enter "a Declaratory Judgment, finding that the Rules and Regulations are a valid exercise of governmental authority" and to "enjoin the Teamsters from further violations of the Rules and Regulations." [Record No. 10, p. 10] There are obvious procedural problems with these requests since the defendant has not filed a responsive pleading and, therefore, has not asserted any claims. Courts ordinarily apply the summary judgment standard in deciding motions for declaratory judgment. *CK Franchising, Inc. v. SAS Servs., Inc.*, 398 F. Supp. 3d 163, 169 (E.D. Ky. 2019) (collecting cases). Further, the party requesting a preliminary injunction has the burden of proving that it is entitled to such extraordinary relief. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974). The defendant has not

satisfied these standards at this juncture.  Accordingly, the defendants' requests will be denied as premature.

**V.**

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      Plaintiff General Drivers, Warehousemen and Helpers, Local Union 89, Affiliated with the International Brotherhood of Teamsters (the "Teamsters") Motion for a Preliminary Injunction [Record No. 7] is **GRANTED**.

2.      Defendants' motions for a declaratory judgment [Record No. 10] and injunctive relief [Record No. 11] are **DENIED**.

3.      Defendants Kenton County Airport Board, doing business as Cincinnati/Northern Kentucky International Airport and Chief Matt Lambert (collectively, "the defendants") and their officers, agents, servants, employees, attorneys, and those acting in active concert with them are **TEMPORARILY ENJOINED** from enforcing the Rules and Regulations of the Kenton County Airport Board Relating to the Operation and Control of the Cincinnati/Northern Kentucky International Airport against the Teamsters in such a fashion as to interfere with, or deprive the Teamsters of their right to engage in peaceful, lawful picketing activity as 289 Wendell H. Ford Blvd. in Erlanger, Kentucky, 41018 (the "Amazon Air Hub"). The defendants are further **ORDERED** to permit the plaintiff and its members to engage in peaceful picketing activity in and around public sidewalks, easements and rights of way around the Amazon Air Hub in Erlanger, Kentucky, forthwith.

4.      This Order shall become effective upon the posting of a $20,000.00 bond by the plaintiff pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

Dated: August 6, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky